629 A.2d 753

**STATE of Maryland**

v.

**Brandon Forrest SHELDON and Thomas Cole.**

**No. 9, Sept. Term, 1993.**

Court of Appeals of Maryland.

Aug. 27, 1993.

48

Gary E. Bair, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for petitioner.

Nancy S. Forster, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for respondent.

Susan Goering, Baltimore, for American Civil Liberties Union of Maryland; Arthur B. Spitzer, Washington, DC, American Civil Liberties Union of the National Capital Area; Curtis L. Culberson and Jeanine Poltronieri, Patton, Boggs & Blow, Washington, DC, for amicus curiae.

Before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

MURPHY, Chief Judge.

A Maryland statute requires those who wish to burn crosses or other religious symbols to do two things: (1) secure the permission of the property owner where the burning is to occur and (2) notify the local fire department before engaging

in the burning. The issue in this case is whether Maryland's "cross burning" law is constitutional.

## I

On October 17, 1991, Brandon Forrest Sheldon ignited a cross on the property of Harry Smith and his family, who are black. Sheldon had not obtained permission to burn the cross on Smith's Prince George's County premises, nor had he notified the local fire department of his intentions. Thus, the State charged Sheldon with a violation of Maryland Code (1957, 1992 Repl.Vol.) Art. 27, § 10A, which provides:

It shall be unlawful for any person or persons to burn or cause to be burned any cross or other religious symbol upon any private or public property within this State without the express consent of the owner of such property and without first giving notice to the fire department which services the area in which such burning is to take place. Any person or persons who violates the provisions of this section shall, upon conviction, be deemed guilty of a felony and shall suffer punishment for a period not to exceed 3 years or shall be fined an amount not to exceed $5,000 or shall suffer both such fine and imprisonment in the discretion of the court.

On March 29, 1992, Thomas Eugene Cole burned a cross on State-owned property in Prince George's County. Cole also had neither secured the State's permission nor notified the area fire department, and he too was charged with violating § 10A.

Sheldon and Cole (appellees) both moved to dismiss their indictments on the ground that § 10A is unconstitutional. On October 26, 1992, the Circuit Court for Prince George's County (Salmon, J.) conducted a hearing on both motions.

The appellees challenged § 10A on five separate constitutional grounds. They claimed that the cross burning statute: (1) on its face violates the free speech provision of the First Amendment to the United States Constitution; (2) as applied violates the free speech provision; (3) violates the establishment clause of the First Amendment; (4) is unconstitutionally

vague; and (5) is unconstitutionally overbroad. The court ruled that the cross burning law on its face violates the free speech clause of the First Amendment, and therefore it did not consider the remaining constitutional challenges.

The court found, first, that although the burning of a cross denotes conduct as opposed to actual speech, the act is sufficiently expressive to qualify for First Amendment protection. Second, the court held that Maryland's cross burning law is sufficiently related to the suppression of free expression so as to warrant strict judicial scrutiny. Third, the court determined that the statute could not withstand strict scrutiny. Finally, the court concluded that the law fell within no doctrinal exceptions which would exempt it from rigorous First Amendment examination. Striking down the statute as unconstitutional, the court granted appellees' motions to dismiss their indictments.

We granted certiorari before intermediate appellate review to consider the important First Amendment question raised in this case.

## II

The First Amendment, literally, protects only "speech" from governmental regulation, but the Supreme Court has "long recognized that [the First Amendment's] protection does not end at the spoken or written word." *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989). Maryland's cross burning statute regulates not pure speech but unspoken conduct, namely, the burning of religious symbols. Thus, before we can decide whether the First Amendment protects that conduct from the statutory regulation, we must decide as a threshold matter whether the conduct qualifies as "speech" for First Amendment purposes. The court below held that it does, and we agree.

In *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), the Supreme Court observed that certain conduct may be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth

Amendments." *Id.* at 409, 94 S.Ct. at 2730. In determining what conduct qualifies, the Court has looked to whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Id.* at 410–11, 94 S.Ct. at 2730. Under this analysis, the Court has determined that a variety of expressive conduct constitutes "speech" for First Amendment purposes. *See e.g. Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing of black armbands to protest American military involvement in Vietnam); *Brown v. Louisiana,* 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (sit-in by blacks to protest segregation); *Johnson, supra,* 491 U.S. 397, 109 S.Ct. 2533 (flag burning to protest the policies of the Reagan administration).

This analysis indicates that the act of burning a cross or other religious symbol must also qualify as "speech" under the First Amendment. Those who openly burn crosses do so fully cognizant of the controversial racial and religious messages which such acts impart. Historically, the Ku Klux Klan burned crosses to express hostility toward blacks and other groups it disfavored, and it is that idea which contemporary cross burners aim to perpetuate. While the burning of other religious symbols may not carry precisely the same implications, such acts at a minimum signal animosity for members of the religion whose symbol is burned. Because of these well known and painfully apparent connotations of burning religious symbols, there can be no doubt that those who engage in such conduct intend to "convey a particularized message," or that those who witness the conduct will receive the message.

Two of the Supreme Court's recent cases reinforce the conclusion that the burning of religious symbols constitutes First Amendment expression. In *Johnson, supra,* the Court determined that the act of burning an American flag is, in certain circumstances, "speech" within the First Amendment's ambit. The Court observed, "Pregnant with expressive content, the flag as readily signifies this Nation as does the combination of letters found in 'America.'" 491 U.S. at 405,

109 S.Ct. at 2540. As powerful an emblem as is the flag, the cross, as the two-thousand-year-old symbol of Christianity, has spiritual connotations affecting more people than the flag of any single nation. We cannot conclude that the burning of a cross, or of other recognized religious symbols, is less expressive than the burning of the American flag.

More importantly, in *R.A.V. v. City of St. Paul, Minnesota,* — U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), to be discussed in detail *infra,* the Supreme Court reviewed a Minnesota statute which provided:

> Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, *a burning cross* or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.

(Emphasis added.) While the Court did not explicitly state that cross burning or other acts prohibited by the statute are expression cognizable by the First Amendment, such a conclusion necessarily precedes the Court's holding that the statute facially violated the First Amendment.

These cases clearly establish that the burning of a cross or other religious symbols is "speech" in the contemplation of the First Amendment. Indeed, the State concedes as much. The more difficult question is whether the First Amendment protects such speech from the regulation of Maryland's statute.

### III

The open and deliberate burning of religious symbols is, needless to say, odious to thoughtful members of our society. Such acts, which allow the cowardly to avoid articulating and defending their irrational beliefs, display contempt for the targeted religious groups and, when crosses are burned, for blacks in particular. The hostility which surrounds these acts makes it imperative, therefore, for us to remain mindful of a most important axiom in assessing the constitutionality of

Maryland's cross burning statute: "If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Johnson,* 491 U.S. at 414, 109 S.Ct. at 2544.

## A

■■■ Maryland's cross burning statute, as we have said, regulates expressive conduct, not actual speech. A statute which regulates only conduct may have nothing to do with restricting speech; its purposes may be entirely benign and within the legitimate interests of government. Thus, in determining whether the First Amendment protects the appellees' conduct from the statutory intervention, we must first decide whether the statute is "related to the suppression of free expression." *Johnson,* 491 U.S. at 403, 109 S.Ct. at 2538. If the statute is unrelated to the suppression of expression, then, according to *Johnson,* we must evaluate the statute by the relatively lenient test the Supreme Court articulated in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). 491 U.S. at 403, 109 S.Ct. at 2538. The *O'Brien* test specifies that

> a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 377, 88 S.Ct. at 1679.

■■■ However, even if the cross burning statute is related to the suppression of expression, we must still judge it under a relatively lenient standard similar to the *O'Brien* test if we find it to be "content-neutral." A content-neutral regulation of speech is one which is " '*justified* without reference to the content of the regulated speech.' " *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29

(1986) (quoting, with emphasis, *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976)). A content-neutral speech regulation typically seeks only to subject the speaker to, in the Court's oft-repeated phrase, "reasonable time, place, or manner restrictions." *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). The standard for adjudicating content-neutral time, place, or manner restrictions is that they are valid "provided that . . . they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark*, 468 U.S. at 293, 104 S.Ct. at 3069; *see Perry Educ. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). The requirement that such restrictions be "narrowly tailored" does not mean that they need be the least restrictive or least intrusive means of serving the government's interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S.Ct. 2746, 2757, 105 L.Ed.2d 661 (1989).

To recapitulate, if we find the cross burning statute to be unrelated to the suppression of expression, we must appraise it under the *O'Brien* test. If we determine the statute to be related to the suppression of expression but content-neutral, we review it under the standard for time, place, or manner restrictions. While the two standards are formally distinct in their application, the Court has observed that the *O'Brien* test "in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions." *Clark*, 468 U.S. at 298, 104 S.Ct. at 3071; *Ward*, 491 U.S. at 798, 109 S.Ct. at 2757.

■■■■ On the other hand, if we find that the cross burning statute is both related to the suppression of expression and not content-neutral, *i.e.* if we find that the statute is content-based, then we must review it under a much more demanding test than either the *O'Brien* or time, place, or manner standards. This is because content-based statutes are presump-

tively invalid, *R.A.V., supra,* —— U.S. at ——, 112 S.Ct. at 2542; *Renton, supra,* 475 U.S. at 45–47, 106 S.Ct. at 928, for such regulations "raise[ ] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster,* —— U.S. at ——, 112 S.Ct. at 508. Thus, content-based restrictions will warrant strict judicial scrutiny: "the State ... must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry, supra,* 460 U.S. at 45, 103 S.Ct. at 955; *see Simon & Schuster v. New York Crime Victims Bd.,* —— U.S. ——, ——, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991). Rarely do laws survive such scrutiny. *Burson v. Freeman,* —— U.S. ——, ——, 112 S.Ct. 1846, 1857, 119 L.Ed.2d 5 (1992).

## B

 We believe the cross burning statute is a content-based regulation of speech, and therefore must be subject to strict scrutiny. The Supreme Court has said:

The principal inquiry in determining content-neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration.

*Ward, supra,* 491 U.S. at 791, 109 S.Ct. at 2754 (citations omitted).

The State argues that its purpose in adopting the cross burning statute was to protect property owners from unwanted fires and to safeguard the community from fires generally. The State insists that the cross burning statute "is not intended to impact upon the right of free expression."[1] For two reasons, we disagree.

---

1. Peculiarly, even as it makes this argument, the State concedes that the statute is content-based. But if the statute's true purposes were unrelated to regulating speech, as the State maintains, then the statute would be content-neutral. We believe the State has misunderstood the distinction between content-neutral and content-based statutes, and we

First, the very definition of content-neutral indicates that the cross burning statute is not. A content-neutral regulation, as noted earlier, is one which is *"justified* without reference to the content of the regulated speech." *Renton,* 475 U.S. at 48, 106 S.Ct. at 929 (emphasis in original). We see no way to justify the cross burning statute without referring to the substance of speech it regulates, because the statute does not protect property owners or the community from unwanted fires any more than the law already protected those groups before the statute's enactment. The General Assembly long ago criminalized the arson of real and personal property, with penalties generally much stiffer than those for cross burning.' Maryland Code (1957, 1992 Repl. Vol.) Art. 27, §§ 6–11.

Likewise, the Legislature has outlawed trespass on posted property and cultivated land, Code, Art. 27, §§ 576, 579B, and trespass remains a common law crime where it amounts to a breach of the peace. *In re Appeal No. 631, Term 1977,* 282 Md. 223, 226, 383 A.2d 684 (1978). The burning of a religious symbol on another's property without permission would certainly constitute trespass and, if the fire spread beyond the burning emblem, perhaps arson. Thus, the cross burning statute adds little in scope to the pre-existing scheme for fire protection created by Maryland's common and statutory law.

Second, the legislative history of the cross burning statute reveals that the State's true purpose in enacting the statute was to express disagreement with the act of burning religious symbols. A bill to address cross burning was first introduced into the General Assembly in 1966, in the midst of an era of racial strife, by Delegate Clarence Mitchell, III, a civil rights activist. The bill, which became law that session, ch. 315 of the Acts of 1966, made the burning of religious symbols a misdemeanor punishable by a fine of $500 and/or 90 days imprisonment. While there is no extensive legislative history of the law as first promulgated, there is ample documentation surrounding the General Assembly's first alteration of the

will not therefore treat the State's concession that the cross burning statute is content-based as dispositive of that issue.

statute in 1980. In that year, several delegates introduced an amendment to the statute to elevate cross burning to a felony and to increase the attendant penalties. H.B. 1078 enjoyed the support of much testimony and numerous letters, which urged the General Assembly to confront "the increased Klan activity throughout the State," to address "the racist activity of cross burning," and the like. The letters and testimony did not focus at all on the importance of protecting property owners and the community from fires. As amended by ch. 204 of the Acts of 1980, burning religious symbols remained a misdemeanor, but the maximum penalties for such acts were increased to a $2,000 fine and one-year jail term.

These changes, apparently, were not enough, for the Legislature revisited the cross burning statute a year later in 1981. Several delegates again introduced a bill to make cross burning a felony and to stiffen the punishment once more. According to Delegate Isaiah Dixon, one of the bill's sponsors, the proposed amendment "recognizes ... despicable acts [of cross burning] for what they are: threats of violence and acts of terror and intimidation." Dixon did not mention the prevention of fires. Another speaker, from the Coalition Opposed to Violence and Extremism (COVE), testified that "the burning of a cross causes considerable fear and conflict *and cannot be treated as a simple act of arson.*" (emphasis added) The Baltimore Jewish Council supported the bill "in the hope that a more stringent penalty will discourage those who would perpetrate this senseless and pointless violence." These comments all indicate that the General Assembly regarded the cross burning statute not as a fire prevention measure but as a means of obstructing the message inherent in cross burning. The Legislature overwhelmingly passed the proposed amendments, making cross burning a felony and raising the maximum penalties to a $5,000 fine and 3 years' imprisonment. Ch. 409 of the Acts of 1981.

The legislative history of the cross burning statute, as well as the very definition of content-neutrality, clearly establish that the statute is content-based. Ordinarily, then, the next step is to review it with strict scrutiny.

## C

■ Before we may do so, however, we must accommodate the fact that "even the prohibition against content[-based statutes] that . . . the First Amendment requires is not absolute." *R.A.V., supra,* —— U.S. at ——, 112 S.Ct. at 2545. In *R.A.V.*, the Supreme Court assessed the constitutionality of the Minnesota statute quoted earlier. The Minnesota Supreme Court had limited the statute by construing it to prohibit only constitutionally proscribable "fighting words," but the United States Supreme Court nonetheless struck down the statute because it outlawed only *politically selected* fighting words, *i.e.* those which insult or incite violence "on the basis of race, color, creed, religion, or gender." Importantly for the instant case, the Court outlined three exceptions to the usual presumption against the constitutionality of content-based statutes (none of which saved the Minnesota law). These exceptions hinged on the fact that the Court has long recognized that certain narrow categories of "speech," such as obscenity, defamation, and fighting words, do not enjoy First Amendment protection from regulation.

The first exception to the general rule against content-based statutes occurs "when the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable." *R.A.V.*, —— U.S. at ——, 112 S.Ct. at 2545. As an example of such a situation, the Court posited that a state could constitutionally proscribe only the most lascivious forms of obscenity, *id.*, at ——, 112 S.Ct. at 2546, because lasciviousness is the very reason obscenity is proscribable in the first place, so there would be "no significant danger of idea or viewpoint discrimination," *id.*, at ——, 112 S.Ct. at 2545, in proscribing certain subsets of obscenity for that reason.

The second exception occurs when an apparently content-based statute has content-neutral intentions, because it aims at the "secondary effects" of the targeted speech and so is *"justified* without reference to the content of the regulated speech." *Renton,* 475 U.S. at 48, 106 S.Ct. at 929 (emphasis in

original); *R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2546. In *Renton,* the Court sustained a municipal zoning ordinance which prohibited adult movie theatres from locating within a thousand feet of residential areas, churches, parks, or schools. The Court found that the ordinance targeted not the content of the movies shown in adult theatres but rather the degenerative secondary effects that such facilities have on the surrounding community in terms of crime, retail trade, property values, and overall quality of life. Because the ordinance targeted only the secondary effects of the speech and not the speech itself, the Court held that

> The ordinance does not contravene the fundamental principle that underlies our concern about "content-based" speech regulations: that "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views."

*Renton,* 475 U.S. at 48–49, 106 S.Ct. at 929, quoting *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). Because the usual concern about content-based statutes is absent from statutes which target secondary effects, the Court concluded, such statutes are properly evaluated under the less demanding standard for *content-neutral* time, place or manner restrictions. *Renton,* 475 U.S. at 50, 106 S.Ct. at 930; *see Clark, supra,* 468 U.S. at 293, 104 S.Ct. at 3068.

The third exception to the presumption against content-based statutes is simply a generalized version of the first exception. It occurs "where totally proscribable speech is at issue ... [and] there is no realistic possibility that official suppression of ideas is afoot." *R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2547. That is, insofar as the First Amendment is concerned, a state may proscribe a certain subset of totally proscribable speech, not only for the very reason the speech is proscribable in the first place, but for any reason demonstrably unrelated to the "official suppression of ideas." To illustrate this kind of situation, the Court suggested that a state could prohibit only those obscene movies featuring blue-eyed

actresses. *Id.* Since all obscenity is proscribable in the first place, a state could constitutionally proscribe the subset of obscenity involving blue-eyed actresses because the targeting of that subset would be utterly unrelated to suppressing ideas.

D

In the instant case, the State does not argue that the first *R.A.V.* exception to the rule against content-based statutes saves the cross burning law. As the State presumably recognizes, were it to cast the cross burning law as an attempt to regulate only the most inciteful of constitutionally proscribable fighting words, it would commit the same mistake as Minnesota in selecting only certain socially charged words for prosecution.

The State argues strenuously, however, that the second *R.A.V.* exception exempts the cross burning statute from strict scrutiny. Citing *Renton,* the State contends that even if the cross burning law appears content-based, it has content-neutral intentions because it aims only at the secondary effects of burning religious symbols, namely, the fire hazards posed to property owners and the community. We do not agree.

For the same reasons we discussed earlier in determining that the cross burning statute was content-based as opposed to content-neutral, we reject the notion that the statute primarily targets the secondary effects of burning religious symbols and thus has content-neutral intentions. First, there is nothing to indicate that the statute has justifiable intentions, for it adds little to Maryland's pre-existing legal scheme for fire protection. Second, the statute's legislative history, as documented above, well establishes that in enacting the statute the State did not endeavor to target the fire hazards or any other secondary effects of burning religious symbols. Rather, the State aimed plainly at the "primary effect" of cross burning, that is, the political idea it expresses.

Also, the city's claim in *Renton* that its zoning ordinance targeted the secondary effects of adult movie theatres was

bolstered by the fact that adult theatres, rather uniquely among business enterprises, do tend to foment undesirable economic consequences. The uniqueness of adult theatres, in the Court's view, justified the selective treatment of them. *See Boos v. Barry,* 485 U.S. 312, 320, 108 S.Ct. 1157, 1163, 99 L.Ed.2d 333 (1988). Here, by contrast, there is nothing particularly unique or dangerous in the act of burning religious symbols relative to other kinds of open fires which justifies special precautions for the former.

It is thus unclear whether the burning of religious symbols presents fire hazards as a significant secondary effect at all. Very few destructive fires, it is safe to say, begin with the conflagration of a religious symbol. Far more dangerous are the burning of leaves or cars, or having barbecues or bonfires; but the State has specially regulated none of these activities. Instead, the State has chosen to regulate such a small subset of potential blazes that its allegedly content-neutral goal of protecting the citizenry from inferno cannot be taken seriously. The State, it seems, desired to create a special penalty for those who burn religious symbols, because its existing trespass and arson laws did not convey its particular political disagreement with such acts.

The State also argues that the third *R.A.V.* exception to the rule against content-based regulations saves the cross burning statute from strict scrutiny. The State claims that the statute does not involve the "realistic possibility that official suppression of ideas is afoot." *R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2547. This contention is completely wrong, for the State ignores the fact that the third *R.A.V.* exception is extant only "where totally proscribable speech is at issue." *Id.* Here, the State has not made the case, as Minnesota did, that the burning of religious symbols constitutes proscribable fighting words. Thus, it has not offered any threshold basis for regulating the burning of religious symbols *at all,* much less justified the singling out of that particular subset of speech as unrelated to suppressing ideas. Even were we to assume, though, that the burning of religious symbols repre-

sents proscribable fighting words, the targeting of that subset clearly *is* related to suppressing ideas. As we have maintained throughout, the statute's legislative history and scant contribution to Maryland's fire protection scheme indicate that the State had precisely censorship in mind.

Because the cross burning statute does not fall within any of the *R.A.V.* exceptions to the constitutional presumption against content-based statutes, we now review the statute with strict scrutiny.

### E

To survive strict scrutiny, a law must be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Perry, supra*, 460 U.S. at 45, 103 S.Ct. at 955. Maryland's cross burning statute cannot survive this scrutiny, because it is not necessary to serve the State's asserted interest.

In a complete turnabout from its earlier arguments, the State proclaims that it has "a compelling interest in protecting the community against bias-motivated threats to public safety and order." It argues that the cross burning statute protects the ideal of equal opportunity for all citizens and furthers the "national commitment to the elimination of invidious discrimination." The State thus abandons its prior posture that the statute is a fire protection measure, and essentially concedes that the statute regulates expression to promote social harmony.[2]

---

2. Presumably, the State no longer asserts that fire protection is the compelling interest behind the statute, as it did at the trial level, because it recognizes that such an interest cannot support the statute in this case. In *Carey v. Brown*, 447 U.S. 455, 467–69, 100 S.Ct. 2286, 2293–94, 65 L.Ed.2d 263 (1980), the Supreme Court held that while a state has compelling interest in protecting privacy, a statutory ban on only nonlabor picketing was unconstitutional because "nothing in the content-based labor-nonlabor distinction has any bearing whatsoever on privacy." *Id.,* at 465, 100 S.Ct. at 2293. Likewise, while fire protection is certainly a compelling interest, the cross burning statute's content-based distinction between burning religious symbols and burning all other objects has nothing to do with preventing fires. The State

To be sure, the State has a compelling interest in protecting the social welfare of all its citizens. Indeed, the promotion of racial and religious tolerance has become not just an interest of Maryland's government but a moral and ethical mission of our entire society, in order both to correct past injustices and to give content to our nation's belief in equality of opportunity. But the Constitution does not allow the unnecessary trammeling of free expression even for the noblest of purposes. "Even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment." *Simon & Schuster,* —— U.S. at ——, 112 S.Ct. at 509.

In the instant case, Maryland's cross burning law simply cannot be deemed "necessary" to the State's effort to foster racial and religious accord. It is always difficult, of course, to determine what tools will be effective, much less necessary, in the quest for social tolerance. But it is safe to say that the cross burning statute, which merely inconveniences a tiny handful of individuals who would openly burn religious symbols, will not prove indispensable to the endeavor for justice. Under the statute, determined individuals may still burn crosses, so long as they notify the local fire department and secure a property owner's permission to conduct the burning.

But even if the statute should deter, or punish, some individuals, it will not show itself a necessary contribution to an atmosphere of tolerance. This is because those who burn religious symbols already harbor bigoted ideas; the State's regulation of one means of expressing those ideas, at best, forces people to vent their views in another way. Official encroachment upon the expression of developed beliefs is no necessary part of civil consonance, because tolerance is an acquired taste. Instead, what is necessary are laws which remedy the *effects* of pernicious beliefs, *see e.g.* Maryland

---

has no compelling interest, from a fire protection standpoint, in establishing special regulations for the relatively few individuals who begin fires with religious symbols. *See Simon & Schuster, supra,* —— U.S. at ——, 112 S.Ct. at 510.

Code (1957, 1991 Repl. Vol.) Art. 49B (anti-discrimination laws), and which thereby force justice on those who are as yet unwilling to embrace it in their hearts and minds.

Maryland's cross burning law is not necessary to its asserted interest in reducing racial and religious bias; therefore, it cannot survive strict scrutiny.

## IV

The burning of religious symbols represents constitutional expression, and Maryland's cross burning statute is a content-based regulation of that expression which is neither exempt from, nor can survive, the First Amendment's presumption against its validity. Thus, the cross burning statute must fall. Those who wish to burn crosses and other religious symbols may do so free of this regulation, but not free of other criminal statutes, or of the public disrepute and countervailing opinions which will ultimately provide the most persuasive rejoinder to such acts.

*JUDGMENT AFFIRMED, WITH COSTS.*